## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNEST HOLDINGS, INC., | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | C.A. No. _____ |
| | : | |
| ASCENSUS, LLC; ASCENSUS BROKER | : | |
| DEALER SERVICES, LLC; and | : | **JURY TRIAL DEMANDED** |
| ASCENSUS COLLEGE SAVINGS | : | |
| RECORDKEEPING SERVICES, LLC, | : | |
| | : | |
| *Defendants*. | : | |

## <u>COMPLAINT</u>

Plaintiff UNest Holdings, Inc. ("UNest"), by and through its undersigned attorneys, hereby brings this action for treble damages against Defendants Ascensus, LLC, Ascensus Broker Dealer Services, LLC, and Ascensus College Savings Recordkeeping Services, LLC (together, "Ascensus") pursuant to Section 4 of the Clayton Act, Sections 1 and 2 of the Sherman Act, and Sections 6-36-4, 6-36-5, and 6-36-11(a) of the Rhode Island Antitrust Act.  Plaintiff complains and alleges as follows:

### <u>Introduction</u>

1.      This antitrust action arises from a longstanding, unlawful, deceptive, and anticompetitive campaign by Ascensus to undermine UNest's business model, muscle UNest out of the industry, and ultimately monopolize the market for an innovative product that UNest pioneered:  a user-friendly mobile application that empowered families of <u>all income levels</u> to save for their children's educations (the "UNest App").

2.      Ascensus is the dominant provider of management services to government-sponsored, tax-exempt college savings plans authorized by Section 529 of the Internal Revenue

Code ("529 plans"), including the CollegeBound 529 plan, sponsored by the State of Rhode Island and administered by the Rhode Island Office of the General Treasurer ("RI Program").

3.    Ascensus leveraged its market power to exclude UNest from the RI Program, and when UNest attempted to migrate its clients from the RI Program to the comparable 529 College Savings Plan in New York (the "NY Program"), Ascensus attempted to block that effort, too, in a move that would have effectively marooned UNest's clients, who had invested in the RI Program and contracted with UNest for financial advisory and account management services provided through the UNest App.

4.    Extensive litigation ensued as UNest made every effort to assert its rights and prevent Ascensus from shutting UNest out of access to its clients' accounts, hindering UNest's ability to transfer those clients to another program manager's 529 plans, and damaging UNest's business model, UNest's contractual relationships with its clients, and UNest's clients themselves.

5.    UNest first sought relief in Rhode Island state court in November 2019 to prevent Ascensus from terminating UNest's access to its clients' accounts in the RI Program, filing suit against both Ascensus and the distributor for the RI Program (the "State Court Action").

6.    UNest, Ascensus, and the RI Program distributor reached a settlement in the State Court Action, but it quickly became clear that the settlement was a pretense and Ascensus was unwilling to comply with its terms, as Ascensus tried to block UNest from rolling its clients' accounts out of the RI Program and into the NY Program as the settlement itself contemplated.

7.    Once again, UNest was compelled to seek relief, filing suit here in the District of Rhode Island (the "Federal Court Action") in December 2019 in an attempt to prevent Ascensus from terminating UNest's access to its clients' accounts in the RI Program while UNest worked

with all deliberate speed to find a new 529 plan for those accounts, since Ascensus had blocked UNest from rolling the accounts over into the NY Program.

8.      At that point, UNest became more concerned that Ascensus' repeated efforts to undermine UNest's business were in furtherance of an intent to muscle UNest out of the market—or at a minimum, stunt UNest's growth—and, potentially, to develop its own app in competition with the UNest App.

9.      In fact, UNest's counsel raised the possibility that Ascensus may have been developing a competing app in court filings and before the Court in the Federal Court Action at a hearing on January 8, 2020, a possibility that Ascensus' counsel outright denied—before the Court—as a "***wild theory***."

10.     That denial turned out to be ***<u>false</u>***.

11.     On February 2, 2021, a mere 13 months later—not nearly enough time for such an app to evolve from concept to launch—Ascensus debuted its "READYSAVE 529" mobile application, which Ascensus touted as a "First-of-Its-Kind Education Savings App" (the "Ascensus App").[1]

12.     Ascensus also announced that two investment firms were planning to buy a majority stake in Ascensus in a deal worth approximately ***$3 billion***, which announcement was likely intentionally timed to coincide with the release of the Ascensus App.

---

[1] For clarity, the UNest App and Ascensus App offer individual ***account*** management services:  investors can view and manage aspects of their individual 529 plan investment accounts through those apps.  Ascensus also offers ***plan*** management services to the individual states:  states sponsoring 529 plans rely on Ascensus to manage those plans at the state level.

91757051v.15

13.     All the while, Ascensus continued to push UNest out of the markets for app-based financial advisory and account management services, including, upon information and belief, making false or misleading representations to other program managers concerning UNest.

14.     As a result of Ascensus' efforts, UNest was terminated from other states' 529 plans and can no longer market 529 plan investments to its clients; effectively, it has been shut out of the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.

15.     Directly as a result of Ascensus' misconduct, UNest was forced to change its business model entirely to offering accounts known as Uniform Transfers to Minors Act accounts ("UTMA accounts").

16.     The forced change to UTMA accounts disrupted UNest's growth trajectory, cost UNest a year of time spent developing and perfecting the UNest App under its previous business model, undercut UNest's efforts to raise capital funds based on a fair valuation of the UNest App, and caused UNest to lose clients, all resulting in significant financial losses and damages to UNest.

17.     By virtue of Ascensus' efforts to shut UNest out of the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans, Ascensus has succeeded at monopolizing these markets:  the Ascensus App is now one of the only apps available that enables users to manage their 529 plan investments, and there appear to be only two other apps that may offer investors in 529 plans some varying degree of ability to obtain financial advisor services and manage their accounts with respect to those investments.  On information and belief, neither comes close to providing the level of enhanced functionality and/or convenience offered by the UNest App or the Ascensus App.[2]

---

[2] Those apps, Backer and Sootchy, launched after the Federal Court Action and after Ascensus' anticompetitive conduct towards UNest began.  Neither participate meaningfully in the relevant markets, and both differ from the

18.     Thus, UNest's persistent belief that Ascensus' conduct was unlawful, anticompetitive and aimed squarely at securing a clear path for the development of a competing Ascensus App turned out to be the truth, not a "wild theory."

19.     In sum, Ascensus abused its market power and influence in the market for 529 plan management services to shut UNest out from the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans, in order to make the markets more attractive through less (or zero) meaningful competition for the eventual launch of its own competing product, the Ascensus App.

## Parties

20.     Plaintiff UNest is a corporation incorporated under the laws of the state of Delaware, with its principal place of business located at 5161 Lankershim Blvd, Suite 250, North Hollywood, CA 91601.

21.     Defendant Ascensus, LLC is a limited liability company organized under the laws of Delaware with its principal place of business located at 200 Dryden Road, Dresher, Pennsylvania 19025.

22.     Defendant Ascensus Broker Dealer Services, LLC is a limited liability company organized under the laws of Delaware with its principal place of business located at 95 Wells Avenue, Suite 160, Newton, Massachusetts 02459.

---

UNest App as follows:  (1) Neither offers any meaningful account management functionality to users with respect to existing 529 plans—Sootchy offers no account management features for existing 529 plans at all, while Backer users can view those plans, but cannot engage in other critical account management functions, such as making changes to an investment portfolio in a given 529 plan, or changing 529 plans entirely.  (2) Neither offers meaningful advisory services, as they *only* enable users to sign up for the direct-sold 529 plan offered by the state of Utah, called "my529." By contrast, UNest aimed to work with *advisor*-sold 529 plans (unlike Utah's my529 direct-sold plan).  That way, UNest, a Registered Investment Advisor (RIA), could sign families up directly, and handle all coordination with the 529 plans itself in its capacity as an RIA.  This critical value-added feature was unique to the UNest App and differentiates it from the lesser-known Backer and Sootchy apps.

91757051v.15

23.     Defendant Ascensus College Savings Recordkeeping Services, LLC is a limited liability corporation organized under the laws of the state of Delaware, with its principal place of business located at 95 Wells Avenue, Suite 160, Newton, Massachusetts 02459.

### Jurisdiction and Venue

24.     This Court has subject matter jurisdiction in this controversy pursuant to 28 U.S.C. § 1331 and 1337(a) because it includes a request for adjudication of claim(s) that present a federal question, including under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Ascensus, for injuries sustained and to be sustained by UNest for violations, as alleged herein, of Section 2 of the Sherman Act, 15 U.S.C. §§ 2.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and involve a common nucleus of operative fact.  The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

26.     Ascensus is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Ascensus manages the RI Program and the NY Program, among numerous others, which impacts investors located in Rhode Island, New York, and nationwide.

27.     This Court has personal jurisdiction over Ascensus, because Ascensus has systematically and continuously transacted substantial business in Rhode Island.

28.     Venue in this District is proper based on 28 U.S.C. § 1391, because, among other reasons, Ascensus transacts business in this District, and a substantial (if not dominant) part of the events or omissions giving rise to the claims occurred in this District.

91757051v.15

**Facts**

***UNest Launches a Unique App That Allows***
***Families to Easily Invest in 529 Plans***

29.    UNest is an SEC Registered Investment Advisor ("RIA") that developed the UNest

App for iPhone and Android devices that allows its investor clients to save for their children's

educations through a government-sponsored, tax-advantaged 529 plan.

30.    In October of 2018, UNest launched the UNest App to the public and began

marketing 529 plans to potential investor clients.

31.    The UNest App offered a simple, four-step process for individuals who wished to

invest in a 529 plan.

32.    First, the prospective investor entered a name and birthdate for the prospective

beneficiary, generally a child or grandchild.  *See* Figure 1.

33.    Second, the prospective investor, typically a parent or grandparent, entered their

own personal information, including a name, phone number, and mailing address.  *See* Figure 2.

| **Figure 1** | **Figure 2** |
|:---:|:---:|
|  |  |

34.     Third, the prospective investor decided on an amount to deposit each month in the 529 plan and could see the potential results of that plan over time.  *See* Figure 3 and Figure 4.

**Figure 3**  **Figure 4**

 

35.     Fourth and finally, the prospective investor provided an electronic signature (*see* Figure 5) and a method of funding the 529 plan, using either a voided check or a bank statement (*see* Figure 6).

**Figure 5**



**Figure 6**



36.     The UNest App provided a unique and substantial benefit to prospective investors, making 529 plans much more accessible and user-friendly across all income levels than their traditional "advisor-sold" counterparts.

37.     UNest offered its innovative services as an advisor for 529 plan investors at an affordable rate—just $3.00 per month—whereas traditional "advisor-sold" 529 plans require broker-dealer involvement (and commissions) and could not be offered at such an affordable rate to the public.

38.     UNest also did not charge commissions like a broker-dealer for 529 plan investments.

91757051v.15

### Ascensus is the Program Manager for
### Multiple States' 529 Plans

39.     All states, including New York, Missouri, Nevada, and Rhode Island, sponsor 529

plans in which individuals can invest.

40.     For example, the RI Program is a 529 plan sponsored by the State of Rhode Island

and administered by the Rhode Island Office of the General Treasurer.

41.     Ascensus is the program manager for the RI Program pursuant to an agreement

between the Treasurer and Ascensus dated March 18, 2016.

42.     Ascensus is also, for example, the program manager for the NY Program,

Missouri's program, the "MOST 529 College Savings Plan" (the "MO Program"), and Nevada's

program, the "SSGA UPromise 529 Plan" (the "NV Program").

### UNest Begins Marketing 529 Plans in the
### RI Program Until It Faces Termination

43.     Invesco Distributors, Inc. ("Invesco") is the distributor of the RI Program pursuant

to an agreement between Ascensus and Invesco.

44.     In May of 2018, UNest and Invesco entered into an agreement under which UNest

was authorized to recommend, on a non-exclusive basis, Invesco-managed municipal fund

securities in the RI Program.

45.     UNest successfully signed up hundreds of families both within and without Rhode

Island for accounts on the UNest App, and those account holders ("RI Clients") were able to begin

investing, through the UNest App, in 529 plans through the RI Program.

46.     However, in October of 2019, Invesco provided written notice (the "*Termination

Letter*") that it was terminating its agreement with UNest.

47.     As a result of the *Termination Letter*, UNest promptly contacted Invesco to ensure

that UNest would be able to maintain uninterrupted access to the web-based client / advisor portal

(an "Advisor Portal," here the "RI Portal") for the RI Program, on behalf of the RI Clients with whom UNest contracted to serve as a Financial Advisor, until the RI Clients' accounts could be safely rolled over into another state's 529 plan.

48.     During a telephone call on or about November 20, 2019, representatives of Invesco and Ascensus informed UNest that its access to the RI Portal would be terminated and/or otherwise limited when the agreement was terminated effective November 30, 2019.

49.     Ultimately, Invesco representatives informed UNest's counsel that any issues regarding continuing access to the portal needed to be discussed with *Ascensus*, because Ascensus, not Invesco, controlled access to the RI Portal that UNest and its clients relied upon.

### *The State Court Action and Subsequent Settlement*

50.     Because those approximately 500 RI Program clients would have been negatively impacted if Ascensus were permitted to terminate UNest's access to its accounts on November 30, 2019, before UNest could safely roll over the RI Clients' accounts into a different state's 529 plan, UNest filed the State Court Action against Ascensus and Invesco to ensure UNest's continued access to the RI Portal.

51.     The parties to the State Court Action then agreed to a settlement that would enable UNest to roll the RI Clients' accounts into a different state's 529 plan (the "*State Settlement Agreement*").

52.     As soon as the parties reached that *State Settlement Agreement*, UNest began the process of attempting to roll its RI Clients' accounts over into the comparable NY Program.

### *Ascensus' Interference with*
### *UNest's Participation in NY Program*

53.     Ascensus, due to its dominance, is also the program manager for the NY Program.

54.     JPMorgan Asset Management ("JPM") is the program distributor for the NY Program, akin to the role of Invesco in Rhode Island.

55.     After initiating the rollover process, UNest received a phone call from JPM that UNest would no longer be allowed to roll over Rhode Island accounts into the NY Program and that all of UNest's current accounts in the NY Program were being "frozen."

56.     UNest later received final notice from JPM that it would be terminated from the NY Program, effective January 6, 2020.

57.     Upon information and belief, Ascensus wrongfully and maliciously caused JPM to terminate UNest's NY Program selling agreement behind UNest's back when Ascensus was supposed to be cooperating with UNest.

58.     JPM informed UNest that Ascensus encouraged the termination because UNest's accounts are "high risk" (which was and remains untrue).[3]

59.     JPM led UNest to believe that Ascensus had accused UNest of being "high risk" to JPM.

60.     Ascensus knew that UNest was rolling its RI Program accounts into the NY Program because Ascensus is the manager for both states.

61.     Ascensus also later admitted that at that time, it was communicating with the NY Program distributor about UNest's accounts in the NY Program.[4]

62.     Ascensus never bothered to call UNest, despite a cooperation provision in the *State Settlement Agreement*, to even alert UNest or discuss what the alleged issue was with the accounts.

---

[3] The argument that UNest's accounts are "high risk" is demonstrably false, as evidenced by an examination of UNest by the Securities and Exchange Commission and a multitude of compliance safeguards in place at UNest.  Such an allegation is a red herring frequently used by Ascensus to defame UNest with program distributors as part of its ongoing anticompetitive conduct.

[4] Ascensus made these admissions in its briefs and at the hearing related to the Federal Court Action, discussed below.

63.     Instead, Ascensus maliciously and nefariously (1) canceled a scheduled call with UNest (specifically to discuss rollover logistics pursuant to the *State Settlement Agreement*) and (2) caused the NY Program selling agreement to be terminated by defaming UNest to the NY Program distributor.

64.     Ascensus' conduct thus prevented UNest from marketing and opening new accounts in two states, Rhode Island and New York.

### *The Federal Court Action*

65.     In an effort to prevent the potential harm stemming from Ascensus' interference with the rollover process and its failure to comply with the *State Settlement Agreement*, on December 20, 2019, UNest filed suit against Ascensus in the District of Rhode Island,[5] initiating the Federal Court Action.

66.     UNest then moved on an emergency basis for a preliminary injunction to enforce the *State Settlement Agreement* and prevent termination of UNest's access to its clients' accounts in the RI Program and, by extension, the RI Clients' app-based access to their 529 plans in the RI Program.

67.     Ascensus thereafter moved to dismiss UNest's complaint in the Federal Court Action.

68.     UNest also moved for leave to file a second amended complaint, for the first time raising antitrust allegations against Ascensus.

69.     Notably, UNest did not (and could not) have any knowledge of the scope and nature of Ascensus' antitrust violations until after signing the *State Settlement Agreement* and realizing

---

[5] The Federal Court Action is captioned *UNest Holdings, Inc. v. Ascensus College Savings Recordkeeping Services, LLC*, C.A. No. 1-19-cv-00659-WES-PAS.

that Ascensus was attempting to deploy its monopoly power in the market for 529 plan management services to keep UNest from competing in (1) the market for app-based financial advisory services for 529 plans, and (2) the market for app-based account management services for 529 plans in multiple states.

70.     Specifically, this aspect of Ascensus' misconduct could not have been apparent until after UNest took steps to comply with the *State Settlement Agreement* and move its 500+ families with 529 plans out of the RI Program and into the NY Program, only to be met with Ascensus' blatant attempts to box UNest out of New York.

71.     The Court then held a hearing on the various pending motions in the Federal Court Action on January 8, 2020.

### *Ascensus—On the Record—Unequivocally Denies It Is Developing an App Similar to the UNest App*

72.     At the January 8, 2020 hearing, counsel for Ascensus flatly denied to the Court, on the record, that Ascensus was developing an application similar to UNest's.  A transcript of that hearing is attached as Exhibit A hereto.

73.     Specifically, after UNest, through counsel, expressed concern that Ascensus' exclusionary conduct toward UNest was motivated by an anticompetitive intent in order to prevent the UNest App from gaining market share while Ascensus developed its own app, counsel for Ascensus stated, "***We're not developing [an app]***; this isn't some conspiracy to knock UNest out." Exh. A, at 21:8-23, 52:20-22 (emphasis added).

74.     Counsel for Ascensus did not stop there, and further referred to UNest's concern that Ascensus was developing its own app to compete with UNest as a "***wild theory***," stating, "*[W]e've got all these wild theories being spun; Oh, we were developing an app.  Well, where's*

14

***the evidence that [we] were developing an app or these other things?***"  Exh. A, at 60:15-18 (emphasis added).

75.     During that hearing, counsel for Ascensus suggested that he and Ascensus were not aware of any other apps for account management of a 529 plan, acknowledging that "[T]he rest of the world is dealing with 529 plans ***not through an app on an iPhone*** but through general access into a website . . . ."[6]  Exh. A, at 77:2-8 (emphasis added).

76.     Thus, Ascensus was aware that at that time, UNest was uniquely situated to compete with Ascensus were Ascensus to develop its own app offering investors account management services for their 529 plans.

77.     The Court then rendered its decision on the pending motions at the hearing, denying Ascensus its motion to dismiss, and granting UNest leave to file a further amended complaint raising additional antitrust allegations against Ascensus, while declining to grant injunctive relief to UNest at that particular time.

78.     Thereafter, Ascensus and UNest entered into a second settlement agreement (the "*Federal Settlement Agreement*").

79.     The false statement that Ascensus made to the Court at the January 8, 2020 hearing that Ascensus was ***not*** developing its own app—a statement Ascensus never corrected—induced UNest to enter into the *Federal Settlement Agreement*, in part, by causing UNest to reasonably believe that its antitrust claims alleged against Ascensus in the Federal Court Action were much weaker than they would have been if in fact UNest had known that Ascensus was developing an app at that time.

---

[6] This representation takes on special significance given that Ascensus would later bill its app in a press release as "First-of-its-Kind," as discussed below.

80.    UNest's agreement to the terms of the *Federal Settlement Agreement* arose from its reasonable and justifiable reliance on Ascensus' representations, including and particularly Ascensus' oral representation to the Court at the January 8 hearing that Ascensus was ***not***, in fact, developing an app at that time.

### Ascensus Announces Its Own App and Continues Its Anticompetitive Conduct Against UNest

81.    Less than 13 months later, on February 2, 2021, Ascensus announced in a press release (the "Press Release") that it was, in fact, releasing its own app:  the Ascensus App.  A copy of the Press Release is attached as Exhibit B hereto.

82.    In the Press Release, Ascensus falsely announced that the app was a "First-of-Its-Kind Education Savings App."  Exh. B, at 1.

83.    Ascensus also advertised that the Ascensus App was already available to account holders in three programs administered by Ascensus:  the MO Program, the NV Program, and, notably, the RI Program from which Ascensus expelled UNest just a year earlier.

84.    Today, the Ascensus App is also available to account holders in programs in 12 additional states, and the District of Columbia.

85.    In the Press Release, Ascensus also stated that it had engaged in a research and development process preceding the development of its Ascensus App.  Exh. B, at 1.

86.    As part of that process, Ascensus referenced that it relied on "dedicated design and development teams" to develop the Ascensus App and bringing it to market.  Exh. B, at 2.

87.    The Ascensus App's advertised features in the "initial release" include the ability for users to view their account balance, transaction history, and investment allocations.  Exh. B, at 1-2.

91757051v.15

88.    Ascensus App users can also use the app to make one-time or recurring contributions, and "see how their savings compare with those of peers in the same plan." Exh. B, at 1-2.

89.    These features are materially similar to the key account management features of the UNest App, utilizing much of the same available data and controls over a customer's particular 529 plan account.

90.    The Ascensus App is also materially similar to the UNest App in look and feel, including its color scheme, as seen in the side-by-side comparisons of each app as it appears in the Apple Store on an iPhone:  the UNest App in Figure 7, and the Ascensus App in Figure 8.


**[SPACE LEFT INTENTIONALLY BLANK]**

17

**Figure 7**





**Figure 8**





91757051v.15

*Development of the Ascensus App Would Have*
*Required Considerably More Than*
*13 Months to Complete*

91.     Upon information and belief, and according to the assessment of industry experts, if up until January of 2020, Ascensus had not even ***considered*** developing an app, as explicitly stated at the January 8, 2020 hearing, it would not be technologically or logistically possible to launch a fully-functional app on both iOS (Apple) and Android platforms, for multiple 529 plans, a mere 13 months later.

92.     Upon information and belief, and according to the assessment of industry experts who have reviewed the Ascensus App, the development of an app of this nature, involving a complex financial product, and undertaken by a large corporation like Ascensus, would require a multi-phased approach and would take at least twenty-four (24) to thirty (30) months from conception until launch.

93.     Accordingly, upon information and belief, and the assessment of industry experts who have reviewed the Ascensus App, in order to have a fully-developed app ready to launch on February 2, 2021, Ascensus would have had to begin the process of writing and creating the Ascensus App by or before **February of 2019**, almost a full year prior to the January 8, 2020 hearing.

94.     Upon information and belief, and the assessment of industry experts, it is likely that Ascensus had already been considering, if not already aggressively developing, the Ascensus App when it engaged in anticompetitive conduct in 2019 and 2020 to prevent UNest from offering the UNest App through the RI Program and the NY Program and providing UNest's services to users in Rhode Island, where Ascensus manages the 529 plan.

95.    Thus, upon information and belief, and the assessment of industry experts who have reviewed the Ascensus App, when Ascensus, through counsel, informed the Court that Ascensus was not developing an app to compete with UNest, that statement was ***false***.

96.    Following Ascensus' announcement of the Ascensus App, Ascensus announced that two investment firms were buying a majority stake in Ascensus in a deal worth approximately $3 billion.

### Ascensus Acted to Eliminate UNest as a Competitor in Other Regions While Developing the Ascensus App

97.    Throughout 2020, even while it was developing the Ascensus App, Ascensus also continued to unlawfully interfere with UNest's ability to enter the market in other states even after the Federal Court Action and subsequent *Federal Settlement Agreement*, a pattern of conduct that ultimately forced UNest completely out of the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans nationwide.

98.    Upon information and belief, Ascensus' interference included—but was not limited to—Ascensus' efforts to harm UNest's reputation with Union Bank & Trust Company ("UBT"), the program manager of the Illinois 529 Bright Directions College Savings Program (the "Illinois Program").

99.    Once UNest was terminated from Ascensus' plans, UBT was essentially UNest's only other option, given that Ascensus—the dominant player in the market for 529 plan management services—had shut UNest out of its controlled states.[7]

---

[7] Moreover, as detailed in Note 2, above, UNest could only offer its business model with respect to states with ***advisor***-sold plans—and those states' plans are dominated by Ascensus through its role as their plan manager.  The Utah my529 plan used by Backer and Sootchy does not support that business model and is run by a state-affiliated program manager, the Utah Higher Education Assistance Authority, at least for now.

100.    In a series of events remarkably similar to, and only a few months following, UNest's termination from the RI Program and the NY Program, UBT terminated UNest's access to the UBT-managed Advisor Portal that enabled UNest to manage the investments of its 2,000+ clients in the Illinois Program.

101.    Upon information and belief, Ascensus made false and/or misleading representations to UBT concerning UNest, the circumstances of UNest's termination from the RI Program and the NY Program, and/or UNest's business model, in an effort to induce UBT to terminate UNest from the Illinois Program.

102.    Upon information and belief, Ascensus deployed its clout and power as a major marketer and provider of 529 plan management services nationwide to orchestrate UNest's expulsion from the Illinois Program, by defaming UNest to UBT or otherwise inducing or convincing UBT to terminate UNest's involvement in the Illinois Program.

103.    Upon information and belief, Ascensus undertook the foregoing actions in furtherance of its effort to:  eliminate UNest as a competitor in the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans; stunt UNest's growth in both markets; clear the path for the Ascensus App; and make itself more attractive to potential investors as one of the only providers of app-based account management services for 529 plans—and the **only** provider with one foot in the market for app-based account management services and the other in the upstream market of 529 plan management services—a market Ascensus **dominates**.

104.    Left without any other meaningful alternative after its termination from the UBT-managed plan, UNest had no choice but to change its business model in November of 2020 from

marketing investments in 529 plans to marketing investments in a different form of tax-advantaged savings plan known as a UTMA account.

105.    The change to UTMA accounts significantly disrupted UNest's growth trajectory, cost UNest a year of time spent developing and perfecting the UNest App under its previous business model, undercut UNest's efforts to raise capital funds based on a fair valuation of the UNest App, and caused UNest to lose clients, all resulting in substantial financial losses and damages to UNest.

106.    In sum, Ascensus abused its market power and clout in the market for 529 plan management services to **expel** UNest from the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans in order to make the markets more attractive through cutting the competition for the eventual launch of its own competing product, the Ascensus App.

### *UNest Has Been Significantly Damaged by Ascensus' Conduct*

107.    Directly as a result of Ascensus' unlawful and anticompetitive conduct, UNest has been significantly damaged, suffering millions of dollars in lost revenue and investment alone.

108.    After Ascensus' anticompetitive conduct pushed UNest out of the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans, UNest lost nearly 2,000 client accounts who did not wish to continue with UNest and invest in an alternative UTMA account.

109.    As a result, UNest lost substantial Assets Under Management ("AUM")—over $200,000 in value—from the accounts lost due to the change from 529 plans to UTMA accounts.

110.    The loss of AUM has also had ripple effects on UNest's finances, as UNest can monetize off its overall AUM, and an increased AUM allows UNest to decrease its cost of sales.

111.    UNest has also lost revenue as a result of the departing accounts; calculated by lost lifetime account revenue (based on an average period of 12 years for each account), UNest faces nearly another $40,000 in damages.

112.    UNest has further missed total monthly revenue from stunted growth resulting from the change in its business model from 529 plans to UTMA accounts.

113.    Specifically, had UNest continued its current trajectory and marketed 529 plan investments throughout 2020 to the present, it would have had the same number of billed accounts as it did one year ago and grown those accounts at an average of 39% per month, calculated based on the actual growth rate of the last 12 months; by those calculations, UNest has lost over $7.5 million in revenue due to this stunted growth trajectory.

114.    UNest has also paid substantial legal fees—over $200,000—from November 2019 through the present date for work related to the State Court Action, Federal Court Action, and otherwise enforcing its rights under its settlement agreements with Ascensus.

115.    UNest also expended monies over and above normal operating expenses to pay for software engineering labor and non-operational salaries for research and development work on the UNest App, including the transition from the 529 plan model to the UTMA model, necessitated by Ascensus' anticompetitive conduct, which amounted to over $300,000 in total.

116.    UNest was also deprived of nearly $25 million in funding from its recent Series A fundraising as a result of Ascensus' conduct, given the difference between the funding received during its Series A fundraising and the funding UNest would have received had it continued its previous trajectory in marketing 529 plan investments uninterrupted by Ascensus' anticompetitive conduct.

91757051v.15

117.    UNest also expects to suffer further damages in the future, including missed funding from its Series B fundraising, namely the significant difference between the anticipated funding received for its Series B fundraising and the funding UNest would have received had it maintained its previous trajectory, estimated to be over $100 million.[8]

118.    In total, UNest has suffered nearly $34 million in damages as a result of Ascensus' unlawful and anticompetitive conduct, and expects to suffer over $100 million more in damages should Ascensus continue to wield its overwhelming market power in the market for 529 plan management services to effectively eliminate UNest and the UNest App from competition in the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.

### Neither Settlement Agreement Forecloses UNest from Seeking Relief from Ascensus' Anticompetitive Conduct

119.    As detailed above, Ascensus' ongoing unlawful, anticompetitive, abusive, and exclusionary conduct continued after the entry of the *State Settlement Agreement*, including Ascensus' efforts to have UNest blocked from rolling over its RI Clients' accounts to the NY Program.

120.    Ascensus' unlawful and anticompetitive conduct continued further after the entry of the *Federal Settlement Agreement*, and as described above, upon information and belief, that conduct included Ascensus' efforts to have UNest expelled from the Illinois Program.

---

[8] To put these numbers in perspective, UNest is aware of several other recent funding rounds by comparable financial technology companies that have raised from $15 million to $2 billion.  UNest is squarely within the range of these companies' recent funding rounds in estimating a $25 million loss from its Series A funding round, and anticipating a further $100 million loss in its upcoming Series B funding round.

91757051v.15

121.    UNest also reasonably and justifiably relied on Ascensus' **false** representations at the January 8 hearing that Ascensus was not developing an app at that time that would eventually compete with the UNest App in deciding to settle the Federal Court Action.

122.    Had Ascensus (truthfully) indicated that it *was*, in fact, developing an app at that time, UNest would not have entered into the *Federal Settlement Agreement* and would have pursued its antitrust claims against Ascensus in the Federal Court Action.

123.    Like any contract, a settlement agreement induced by fraud or material misrepresentations cannot be enforced.

124.    Thus, neither settlement agreement forecloses UNest from pursuing relief from Ascensus' ongoing unlawful and anticompetitive conduct.

## COUNT I
## (Violation of Sherman Act § 2 – Unlawful Monopolization)

125.    UNest incorporates paragraphs 1-124 as if fully set forth herein.

126.    The relevant market is the market for providing 529 plan management services, such as to the RI Program and NY Program, in the United States.

127.    Ascensus has monopoly power in the market for 529 plan management services, with customers primarily constituting government-sponsored tax-exempt 529 college savings plans in the United States.

128.    Upon information and belief, Ascensus provides such 529 plan management services for 29 or 30 of approximately 45 such plans nationwide, resulting in a market share between 65%-70%.

129.    Upon information and belief, Ascensus also has a 100% market share in the states in which it contracts to serve as manager for that state's 529 plan.  In other words, once installed as a particular state's 529 plan manager by contract, Ascensus is the only provider of management

25

services of that state's 529 plan, and serves as "gatekeeper" of any and all access and interaction with such 529 plan.

130.    By either measure, the 65-70% nationwide share, or the 100% share on a state-by-state basis, Ascensus has monopoly power in the relevant market:  529 plan management services.

131.    In order for UNest to participate in the downstream market for the provision of (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans, it has no choice but to deal with Ascensus in the 65-70% of states where Ascensus serves as manager.

132.    Ascensus has willfully maintained and abused its monopoly in the market for 529 plan management services to government-sponsored tax-exempt 529 college savings plans by abusing and leveraging its market dominance to exclude UNest from the downstream markets for the provision of (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.

133.    Ascensus' unlawful maintenance and abuse of its monopoly power includes, but is not limited to, the following conduct: (a) terminating or causing to be terminated the RI Selling Agreement and refusing to re-enter into a contract with UNest or cause such contract to be entered into, which locks UNest out of the aforementioned downstream markets in Rhode Island; (b) terminating or causing to be terminated the NY Selling Agreement and/or refusing to enter into a contract with UNest, which locks UNest out of the aforementioned downstream markets in New York; (c) defrauding UNest into entering the Federal Settlement Agreement by telling the Court that it was not developing an app when such a statement was false; (d) defaming UNest to 529 plan distributors, program managers, and other related parties including JPM, Invesco, and UBT, with the intent and effect of preventing those parties from dealing with UNest in the

26

aforementioned downstream markets; (e) Ascensus, alone and in concert with others, preventing UNest from rolling its Rhode Island accounts into any other state's plan that is managed by Ascensus; and (f) Ascensus, alone and in concert with others, preventing and threatening to prevent UNest from servicing its own clients' accounts by restricting access to Advisor Portals, which Ascensus alone controls.

134.    Ascensus' acquisition or maintenance of its monopoly over the market for providing 529 plan management services is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

135.    There is no procompetitive justification for Ascensus' anticompetitive conduct that outweighs its anticompetitive effects, *i.e.* the prevention of access to and competition in the downstream markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.  Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

136.    As a direct and proximate result of Ascensus' monopolization of the market for providing 529 plan management services in violation of Section 2 of the Sherman Act, UNest has suffered injury to its business and property and damages in an amount to be determined at trial.

137.    The injury to UNest was a foreseeable consequence of Ascensus' anticompetitive and unlawful conduct, described herein, which was done with the intent of monopolizing the aforementioned downstream markets, specifically in order to benefit and enhance the development and launch of the Ascensus App.

91757051v.15

138.    As a direct and proximate result of Ascensus' unlawful monopolization in violation of Section 2 of the Sherman Act, UNest has suffered injury to its business and property and seeks damages in an amount to be proven at trial.

**COUNT II**
**(Violation of Sherman Act § 2 – Attempt to Monopolize)**

139.    UNest incorporates paragraphs 1-138 as if fully set forth herein.

140.    The relevant markets are the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.

141.    Ascensus has attempted and is continuing to attempt to acquire and possess monopoly power in the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.

142.    Ascensus has willfully engaged in predatory and anticompetitive behavior with the specific intent of monopolizing the relevant markets.

143.    Ascensus' attempt to monopolize includes, but is not limited to, the following conduct: (a) terminating or causing to be terminated the RI Selling Agreement and refusing to re-enter into a contract with UNest or cause such contract to be entered into, which locks UNest out of the aforementioned downstream markets in Rhode Island; (b) terminating or causing to be terminated the NY Selling Agreement and/or refusing to enter into a contract with UNest, which locks UNest out of the aforementioned downstream markets in New York; (c) defrauding UNest into entering the Federal Settlement Agreement by telling the Court that it was not developing an app when such a statement was false; (d) defaming UNest to 529 plan distributors, program managers, and other related parties including JPM, Invesco, and UBT, with the intent and effect of preventing those parties from dealing with UNest in the aforementioned downstream markets; (e) Ascensus, alone and in concert with others, preventing UNest from rolling its Rhode Island

accounts into any other state's plan that is managed by Ascensus; and (f) Ascensus, alone and in concert with others, preventing and threatening to prevent UNest from servicing its own clients' accounts by restricting access to Advisor Portals, which Ascensus alone controls.

144.    Ascensus' scheme to monopolize the relevant markets has succeeded in excluding and foreclosing competition and there is, and has been at all times relevant hereto, a dangerous probability of success of Ascensus continuing to monopolize the markets, as evidenced by Ascensus' launch of one of the only app-based account management services for 529 plans to individual investors in the United States, in the wake of forcing UNest from these relevant markets,[9] and in the context of Ascensus' dominant position in the upstream market for 529 plan management services.

145.    There is no procompetitive justification for Ascensus anticompetitive conduct that outweighs its anticompetitive effects, *i.e.* the prevention of competition in the relevant markets. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

146.    As a direct and proximate result of Ascensus' attempted monopolization of the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans for individual investors in the United States in violation of Section 2 of the Sherman Act, UNest has suffered injury to its business and property and damages in an amount to be determined at trial.

---

[9] As described in note 2 above, the app Backer also ostensibly offers some form of app-based account management services for 529 plans. However, it is not possible to use Backer to actually manage of a 529 plan account other than one opened through the Utah my529 plan (*i.e.*, for a previously existing 529 plan account). In other words, unless users open a Utah my529 plan, they cannot do anything other than view an existing 529 plan account in Backer: they cannot make additional deposits, change plans, change their portfolio, or perform any other action. The Backer app, in effect, allows users to "view" their existing 529 plan accounts—***not*** manage them—and for that reason, it is not a meaningful participant in the market for app-based account management services for 529 plans. Moreover, neither Backer nor Sootchy offer families the ability to invest in advisor-sold 529 plans; both direct all clients to a single state's 529 plan, and essentially function as lead generators for my529—***not*** as financial advisors.

147.    The injury to UNest was a foreseeable consequence of Ascensus' anticompetitive and unlawful conduct, described herein, which was done with the intent of monopolizing the relevant markets.

148.    As a direct and proximate result of Ascensus' unlawful attempt to monopolize in violation of Section 2 of the Sherman Act, UNest has suffered injury to its business and property and seeks damages in an amount to be proven at trial.

## COUNT III
### (Violation of Sherman Act § 1 – Exclusive Dealing)

149.    UNest incorporates paragraphs 1-148 as if fully set forth herein.

150.    The relevant markets are the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.

151.    Ascensus has persuaded or coerced Invesco, JPM, UBT, and other parties not to do business with UNest, including through the use of defamation and misrepresentation about UNest's accounts.

152.    This exclusionary conduct substantially foreclosed competition in the relevant markets by preventing UNest from accessing Advisor Portals that are controlled by Ascensus and other servicing infrastructure generally necessary to meaningfully compete in the relevant markets which are downstream of the market for 529 plan management services.

153.    The anticompetitive effects of these exclusionary agreements in the relevant markets exceeded their procompetitive benefits, if any, and if any procompetitive benefits were caused, they could have been achieved by less restrictive means, and the restraints as alleged here were not reasonably necessary to achieve those procompetitive benefits.

91757051v.15

154.     As a direct and proximate result of this exclusionary conduct in the relevant markets in violation of Section 1 of the Sherman Act, UNest has suffered injury to its business and property and damages in an amount to be proven at trial.

### COUNT IV
### (Violation of Sherman Act § 2 – Denial of Access to Essential Facility)

155.     UNest incorporates paragraphs 1-154 as if fully set forth herein.

156.     The relevant markets are the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans for individual investors in the United States.

157.     Ascensus has monopoly power in the upstream market for 529 plan management services.

158.     Ascensus has unlawfully used its monopoly power in that market to restrict UNest's access to an essential facility necessary for UNest to compete in the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans with the intent and effect of eliminating competition in the downstream markets by preventing downstream competitors from accessing the facility.

159.     The essential facilities at issue are 529 plans nationwide.  The downstream markets are the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans for individual investors in the United States.

160.     UNest and other companies offering (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans, if any, cannot reasonably recreate access to 529 plans in states in which Ascensus manages the plan, without going through Ascensus, due to Ascensus' power in those individual relevant markets.

161.     Ascensus could easily and feasibly provide UNest access to the essential facilities.

31

162.    Ascensus has denied UNest access to those essential facilities without any legitimate business purpose therefor and with the intent of preventing UNest from competing in the relevant market.

163.    Ascensus' unlawful restriction of UNest's access to the essential facilities have directly, proximately and foreseeably caused antitrust injury to UNest, specifically by, without limitation, preventing UNest from providing (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans to its RI Program account clients and its NY Program account clients, preventing UNest from rolling its RI Program account clients into the NY Program consistent with the Parties' *State Settlement Agreement*, and by preventing UNest from providing (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans to investors in connection with any other advisor-sold 529 plan.

164.    As a direct and proximate result of Ascensus' unlawful restriction of access to the essential facilities in violation of Section 2 of the Sherman Act, UNest has suffered injury to its business and property and seeks damages in an amount to be proven at trial.

## COUNT V
### (Violation of § 6-36-5 of the Rhode Island Antitrust Act: Attempt to Monopolize)

165.    UNest incorporates by reference paragraphs 1 through 164 above, as if fully set forth herein.

166.    The relevant markets are the markets for (1) app-based financial advisory services for 529 plans and (2) app-based account management services for 529 plans.

167.    UNest restates and reincorporates the allegations set forth in paragraphs 138 through 145 above, which also give rise to a violation of the Rhode Island Antitrust Act.

168.    The injury to UNest was a foreseeable consequence of Ascensus' anticompetitive and unlawful conduct, described herein, which was done with the intent of monopolizing the relevant markets.

169.    UNest has thus suffered injury to its business and property and seeks damages in an amount to be determined at trial.

## COUNT VI
## (Tortious Interference with Contractual Relations)

170.    UNest incorporates by reference paragraphs 1 through 169 above, as if fully set forth herein.

171.    This claim is brought pursuant to Rhode Island common law.

172.    Ascensus knew that UNest had entered into agreements (the "Selling Agreements") with the plan distributors of the NY Program and Illinois Program.

173.    Ascensus intentionally, improperly, and without justification acted with the purpose of interfering with the Selling Agreements by engaging in the conduct described herein, including, but not limited to:  (a) upon information and belief, contacting the program managers and/or plan distributors for the NY Program and the Illinois Program to coerce or induce them to terminate UNest's Selling Agreement, often using false or defamatory statements; (b) using its market power and clout to induce the program managers and/or plan distributors for the NY Program and the Illinois Program to terminate UNest's Selling Agreement, and (c) conspiring to prevent UNest from contracting to market 529 plans in the NY Program and the Illinois Program.

174.    Ascensus' conduct substantially interfered with and prevented UNest from further contracting with the program managers and/or plan distributors of the NY Program and the Illinois Program, resulting in substantial damages to UNest.

## PRAYER FOR RELIEF

WHEREFORE, UNest hereby prays that this Court:

(a)     Enjoin all anticompetitive conduct of Ascensus;

(b)     Enter judgment for UNest on all counts of this Complaint;

(c)     Adjudge and declare that Ascensus has engaged in unlawful conduct in violation of Sections 1 and 2 of the Sherman Act and Section 6-36-5 of the Rhode Island Antitrust Act, R.I. Gen Laws § 6-36-1, *et seq.*;

(d)     Adjudge and declare that Ascensus has tortuously interfered with UNest's contractual relations;

(e)     Award UNest damages in an amount to be proven at trial, with damages for its violation of Sections 1 and 2 of the Sherman Act to be trebled with interest;

(f)     Award UNest damages in an amount to be proven at trial, with damages for its violation of Section 6-36-5 of the Rhode Island Antitrust Act to be trebled with interest; and

(g)     Award UNest the costs of this suit, including the expenses of discovery and document production, and its reasonable attorneys' fees.

## DEMAND FOR TRIAL BY JURY

Pursuant to *Federal Rule of Civil Procedure* 38(b), UNest hereby demands a trial by jury on all issues so triable.

91757051v.15

UNEST HOLDINGS, INC.

By its Attorneys,


*/s/ Joseph A. Farside, Jr.*
Joseph A. Farside, Jr., Esq. (#7559)
Krystle G. Tadesse, Esq. (#7944)
Samantha M. Vasques, Esq. (#9386)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)
joseph.farside@lockelord.com
krystle.tadesse@lockelord.com
samantha.vasques@lockelord.com


Dated:  May 7, 2021

91757051v.15